FRANK K. DOAN, Respondent, v. ST. LOUIS, KEOKUK AND NORTHWESTERN RAILWAY COMPANY, Appellant.

### St. Louis Court of Appeals, December 24, 1889.

1. **Common Carriers:** PLEADING. In an action against a common carrier on a contract for the carriage of a horse, charging that the horse was killed, while in transit, through the negligence of the carrier, it is not essential for the plaintiff to establish the negligence in the first instance, since, in the absence of a special contract, the carrier would ordinarily be liable under his common-law obligations.

2. ———: NEGLIGENCE : SPECIAL CONTRACT. A common carrier cannot, by special contract, exonerate himself from liability for the negligence of himself or his servants; nor can the carrier limit the amount of his liability for negligence, though there may be an agreement for liquidated damages, made in good faith, and in reliance upon representations of the shipper.

3. ———: ———. Although the owner agreed to load, and did load, the horse on the car of the carrier, and negligently left it untied, still, if the carrier moved the car while the horse was loose, and injury resulted therefrom, the carrier is liable, provided that the injury was one likely to result from its action under the circumstances.

4. **Instructions.** The refusal of an instruction, warranted by the evidence and correctly stating the law, is error, notwithstanding the improbability of the truth of such evidence.

5. ———: NOT WARRANTED BY EVIDENCE. An instruction based upon a hypothesis of fact, not established by any evidence in the cause, is erroneous.

*Appeal from the St. Louis City Circuit Court.*—HON. JACOB KLEIN, Judge.

REVERSED AND REMANDED.

*H. H. Trimble* and *Reynolds & Lewis*, for the appellant.

An agent employed to ship goods to the owner has authority to make such contract with the carrier as in the honest exercise of his discretion he sees fit. *Shelton v. Desp. Co.*, 59 N. Y. 258. An authority to deliver goods to a carrier for transportation includes all the necessary and usual means of carrying it into effect. It can only be executed by obtaining the consent of the carrier to receive them, and the agent is therefore authorized to stipulate for the terms of transportation and sign a contract thereof. *Nelson v. Railroad*, 48 N. Y. 498; Story on Agency [8 Ed.] sec. 58; 1 Wait's Action & Def., pp. 216 and 222; 98 Mass. 239; 3 Wallace, 113. The recovery is limited in this case to one hundred dollars. *Harvey v. Railroad*, 74 Mo. 88; *Brown v. Railroad*, 18 Mo. App. 568; *McFadden v. Railroad*, 92 Mo. 343; *Hart v. Railroad*, 112 U. S. 331; *Hill v. Railroad*, 28 A. & E. Cas. 87. Liability for negligence includes injuries which are the natural and probable consequences of negligence or omission. It does not extend to consequences which no reasonable man would expect. Pierce on Railroads, p. 310.

*T. J. Rowe*, for the respondent.

The statute, section 598, Revised Statutes, 1879, expressly provides that a common carrier receiving goods for transportation and issuing a bill of lading, "shall be liable for any loss, damage or injury to such property, caused by its negligence." That the carrier

cannot shield himself from paying the actual loss, damage or injury behind a special contract, and that he must pay all the loss, damage or injury occasioned by his negligence, and cannot himself fix the amount of such loss, damage or injury (*McFadden v. Railroad*, 92 Mo. 349; *Harvey v. Railroad*, 74 Mo. 538) was decided during the October term, 1881, of the supreme court, and the action was on a special contract for the transportation of a trotting gelding named "Nino," made long prior to the act of June 11, 1879. See Laws, 1879, p. 171.

THOMPSON, J., delivered the opinion of the court.

The petition in this action states that the defendant is, and was at the times hereafter mentioned, a corporation and a common carrier of goods and chattels for hire between St. Louis and Louisiana in the state of Missouri; that, on the twenty-second day of November, 1888, at St. Louis, in consideration of the sum of six dollars and thirty cents then paid to the defendant by the plaintiff, the defendant undertook and agreed safely to carry from St. Louis to Louisiana and there deliver to the plaintiff or his order two horses, one a bay horse, and one a golden sorrel horse, sixteen hands high, foaled May 10, 1882, and named Transient, which the plaintiff then and there delivered to the defendant, who received the same upon the agreement and for the purposes before mentioned; that the said horse Transient was valued at fifteen hundred dollars; that the defendant did not safely carry and deliver the said horse Transient pursuant to said agreement, but, on the contrary, the defendant so negligently conducted and so misbehaved in regard to the same in its calling as carrier, that it carelessly and negligently suffered and permitted said sorrel horse Transient to fall out of its car on November 22, 1888, and to be run over and killed by its train, so that said horse was wholly lost to this plaintiff, to his damage in the sum of fifteen hundred dollars.

The answer admits that, on the twenty-second day of November, 1888, the defendant received for shipment from the St. Louis Union Stock-yards Company, the agent of the plaintiff, two horses from St. Louis to Louisiana, Missouri, said to be the property of the plaintiff, and that within a few minutes thereafter one of the horses was killed; but the defendant denies that its agents, servants or employes were guilty of any negligence or carelessness in killing the horse. The answer then sets up a special contract of carriage in the following language : "Defendant further answering says, that at the time it received said horse it entered into a valid agreement, which said agreement was for a valuable consideration, a copy of which is hereto attached, marked Exhibit A, and made a part of this answer, by which said agreement, said plaintiff contracted to superintend the loading of said horses, and that said horses were in fact loaded by plaintiff or his agents, and that the injuries complained of were the result of the manner of loading, and not of negligence committed by defendant after said horses were delivered to it as a common carrier. And defendant answering further says that in said agreement it was also further agreed that, if either of said horses were injured or killed, the liability of said defendant company for damages should not exceed the sum of one hundred dollars for each horse injured or killed; so that defendant says, even though it may have negligently carried said horse, and the injury and death of said horse may have been the result of such negligence, that the damage for the same is limited by special agreement to the sum of one hundred dollars." The answer then denies that the value of the horse was fifteen hundred dollars, and concludes in the usual manner.

The reply consisted of two parts: (1) A general denial of the new matter set up in the answer. (2) A plea of *non est factum* as to the special contract set up in the answer.

On the issues thus made the cause went to trial before a jury, and there was a verdict and judgment for the plaintiff in the sum of twelve hundred and seventy-seven dollars and ninety-two cents.

The plaintiff adduced evidence to the substantial effect that he had a very fine blooded horse named Transient, which he desired to send to Louisiana, Missouri, to be there wintered; that he sent along a common horse to keep company with Transient; that the two were taken, in the middle of the day, from his stable in St. Louis, to the St. Louis Union Stock-yards Company, to be by that company loaded upon a car of the defendant for the purpose of being so shipped; that the employe of the plaintiff, who thus took the horse to the St. Louis Union Stock-yards Company, delivered to the agent of that company seven dollars in money, six dollars and thirty cents of which was to pay the freight on the horse to Louisiana, and seventy cents of which was to pay for the necessary hay to be put into the car; that the servants of the stock-yards company in the presence of a switchman of the railroad company, then acting as its foreman, loaded the horses into one of the defendant's cars, and left them untied in the car. The evidence adduced by the plaintiff also showed that the horse Transient in some manner escaped from the car, fell upon the track, and was run over and killed.

Touching the manner in which the horse was killed, the defendant gave evidence tending to show that, at the request of the servants of the stock-yards company, the acting foreman of the defendant, who had control of the making up of its trains, opened the end door or window of the car in which the horses had been placed without being tied; that this end door or window was an aperture commencing about half way up from the bottom of the car eighteen inches wide and thirty inches high; that, after the horses had been thus placed in the car and the side door securely fastened, and this aperture opened to give

them ventilation, the acting foreman beckoned to the engineer to move the car forward for the purpose of attaching it to the train; that, when the engine started forward with the car, the horse Transient became frightened and actually jumped through this small aperture upon the track, and was run over and killed.

Touching the special contract set up in the answer, we find, on reading the record, that the burden was on the defendant to show that this contract had been executed at the time when the horse was killed. The horses had been delivered by the plaintiff's employe to the stock-yards company, with shipping directions, and with money sufficient to pay the freight and to purchase some hay to be placed in the car. In the view which the court took in one of the instructions which it gave, the stock-yards company was thus constituted the agent of the plaintiff to do what was necessary in the shipment of the horses, and consequently to sign for him the necessary or usual shipping contract. The defendant's evidence tended to show that this shipping contract was in fact signed by the clerk of the stock-yards company, who also had authority to sign for the railway company, prior to the time when the horse was killed; but, as the burden was on the defendant to establish this fact, it became a question for the jury. The trial court could not treat it as an established fact, since the credibility of the testimony by which it was sought to establish it was for the jury; nor can we so treat it for the same reason.

It is perceived that the plaintiff did not draw his petition upon the mere theory of charging the defendant on its common-law liability as a common carrier, but alleged that the horse was killed through the negligence and misbehavior of the defendant. The plaintiff thus tendered the issue of negligence. The answer denies that the servants of the defendant were guilty of any negligence or carelessness in killing the horse.

The issue of negligence on the part of the defendant was thus made an issue in the case. But it was not an essential issue. If the allegations of negligence and misconduct are eliminated from the plaintiff's petition, it will still state a cause of action; because, in the absence of a special contract, which the petition does not set out, and with certain other well known exceptions, a common carrier is liable as an insurer. We suppose that the plaintiff would have made out his case by proving merely the delivery of the horse to the defendant as a common carrier, to be carried to Louisiana for a reward, and the non-delivery of the horse by the defendant. In such a case the allegation of negligence and misconduct might have been regarded as surplusage, under the rule of pleading that *utile per inutile non vitiatur.* · *Freeland v. McCullough,* 1 Denio, 414; s. c., 43 Am. Dec. 685, 693; *Nelson v. Lounsbury,* 3 Barb. 127; *Crocker v. Mann,* 3 Mo. 472. The rule is the same even in respect of surplusage in indictments, where greater strictness is required. *Commonwealth v. Jeffries,* 7 Allen (Mass.) 548; s. c., 83 Am. Dec. 712; *State v. Freeman,* 8 Ia. 428; s. c., 74 Am. Dec. 317. The plaintiff, therefore, made out a *prima facie* case without proof of negligence. To enable the defendant to rebut this case on any theory within the range of the evidence, except that of the negligence of the agents of the plaintiff in loading the horse, it was essential to prove its averment of a special contract, reducing its common-law liability as a common carrier from that of an insurer to that of an ordinary bailee for hire. Whether such a contract had been in fact signed at the time when the horse was killed, was, therefore, a fact material to the defense.

It is the settled law in this state that a common carrier cannot by contract with the shipper exonerate himself from liability for the negligence of himself and servants in the performance of the duty which he has

undertaken. *Ketchum v. American Express Co.*, 52 Mo. 390; *Read v. Railroad*, 60 Mo. 199; *Rice v. Railroad*, 63 Mo. 314; *Ball v. Railroad*, 83 Mo. 574, and many other cases. The second essential question in the case, therefore, was whether the defendant, through its servants, had been guilty of negligence in the discharge of the duty which it had undertaken in behalf of the plaintiff. The defendant's theory of the evidence is that there was no evidence tending to show negligence on the part of any servant of the defendant. The defendant's argument on this point proceeds upon the view that, under the special contract shown in evidence, it became the duty of the plaintiff to superintend the loading of the horses. It is true that the special contract contains such a provision, and we take it as an uncontroverted fact, both on the plaintiff's and the defendant's evidence, that the horse was loaded by the servants of the stock-yards company acting as the plaintiff's agent. The defendant's theory further is that the plaintiff, acting through its agent, the stock-yards company, by the servants of the latter company, in loading the horses directed the opening of the end door of the car, and that, if the acting foreman of the defendant obeyed this direction, it was an act for which the defendant was not responsible; in other words, the plaintiff, having assumed by the contract and in fact the duty of loading the horse, was responsible for the manner in which it was loaded, and had a right to direct the opening of the end door, and made the direction at his peril; and that the servant of the defendant, in obeying the direction, was not acting for his master but for the plaintiff. The court, however, took the view, that, although the servants of the stock-yards company, acting for the plaintiff, may have directed the manner of the loading of the horses, yet the defendant would be liable for obeying the direction through its servants, if it was probable, that, by so doing, the

horse would endeavor to escape or get injured, if an attempt were made to move the car. This will be perceived by reading the two following instructions, which were tendered by the defendant and given by the court, after modifying them so as to insert this element in their concluding language :

"7.   The court instructs the jury if they find that the car was loaded by the Union Stock-yards Company, and appeared to have been loaded in the customary and usual way of loading such cars, and that there was no negligence apparent in the manner of loading said car, then defendant was justified in taking possession of said car and removing the same for the purpose of transportation, and would not be liable for any damage · sustained by plaintiff in consequence of the escape of the horse from the car, unless it was apparent to the defendant, or to its agents who handled said car, that it was probable said horse would endeavor to escape or get injured if an attempt was made to remove said car.

"8.   If you find from the evidence in this case that the Union Stock-yards Company did in fact load said horses, and defendant had no hand whatever in loading said horses, or in preparing the car to safely carry the same, except under the directions of the agent of the Union Stock-yards Company, and, if you find from the evidence that the defendant undertook to move said car with said horses loaded by said Union Stock-yards Company, and without making any change in the manner of loading, except as directed by said Union Stock-yards Company, and did remove said car, and during its removal said horse escaped and was injured, then and under such circumstances the defendant was not responsible for the method of loading said horses adopted by the said Union Stock-yards Company, and could not be made so responsible, unless said railroad company, defendant or its agents handling said car, saw or by the use of ordinary care and prudence could have seen that there was a probability that

the horse would try to escape from the car and get injured."

One of the assignments of error is the action of the court in so modifying these instructions. We see no error in this action of the court. Although the plaintiff, through his agents, assumed the duty of loading the horses, yet we are of opinion that, if his agents had left them in such a manner that the car obviously could not be moved with safety to the horse, and, notwithstanding this, the car was moved and one of the horses was injured, the defendant would be liable on the ordinary rule of negligence laid down in the leading case of *Davies v. Mann*, 10 Mees. & W. 545. The principle there ruled was that, if one man sees the property of another man negligently exposed to injury, the former must, notwithstanding the negligence of the owner of the property, use reasonable care to avoid injuring it.

On the other hand, we think that the court erred in refusing the following instruction, tendered by the defendant:—

"Negligence is the doing of an act which experience indicates will probably result in injury to another. If the jury find that the horse escaped from a door or window in the end of a car in which it had been loaded, and if, from the structure, size and elevation of said door or window, and the size of the horse that was injured, it was wholly improbable that said horse could escape through said end door or window, then starting said car with said door or window open would not be negligence, and defendant would not be liable for the escape of the horse through said door or window, if he did so escape and get killed."

This instruction was directed to the evidence, adduced by the defendant, to the effect that the horse jumped out of the end window. The credibility of this testimony was for the jury. The plaintiff evidently did.

not believe it. Certainly it seems improbable that a large horse, as this is shown to have been, could have jumped through an aperture but eighteen inches wide and thirty inches high. But one of the witnesses for the defendant testified that he saw the horse jump through that aperture. It was, therefore, a question for the jury whether the horse got out of the car in that way and just in so far as, upon ordinary human experience, it was improbable that a horse of that size could so escape, the defendant is relieved from the imputation of negligence in moving the car with the horse loose in it and the aperture open. The defendant had a right to the benefit of this view; and the plaintiff, on the other hand, had a right to the benefit of the only remaining theory of fact as to the manner in which the horse escaped, in case the jury disbelieved this witness, which was, that it escaped through the side door, that being the only aperture except the window.

Complaint is made of the action of the court in giving the following instruction:—

"1. The court instructs the jury that unless they find and believe from the evidence that the bill of lading read in evidence, and dated November 22, 1888, was entered into in behalf of the plaintiff by the officers of the Union Stock-yards before said horse, "Transient," was killed, it is not binding on the plaintiff. And the court further instructs you that, even though you find from the evidence that said bill of lading was entered into before said horse was killed, still it is not binding on the plaintiff, unless you find from the evidence that the defendant, in consideration of the stipulation therein contained, either agreed to carry said horse for less than the usual and reasonable rates for carrying horses of that character from St. Louis to Louisiana, Missouri, or gave to the plaintiff some advantage or benefit in shipping and carrying said horse, which he would not have received but for entering into said contract. But

if you find from the evidence that the plaintiff did, by reason of the entering into the said bill of lading or "Live-stock contract," read in evidence in his behalf, by the said Union Stock-yards Company, receive such reduction of rates for the transportation of said horse, or did receive some other advantage or benefit in shipping and carrying him as above indicated, then said contract was, and is, binding on him, if you find from the evidence that it was entered into in his behalf as stated in the other instructions of the court."

It is perceived that this instruction contains two distinct elements; it submits to the jury the question of the validity of the special contract, pleaded by the defendant in its answer, in two aspects. In the first place, it submits to the jury the question whether such a contract had been entered into before the horse was killed, instructing the jury that if it had not been so entered into, it was not binding on the plaintiff. We have already observed that the burden of establishing this fact was upon the defendant, and that it was a question for the jury. In this branch of the instruction there was, therefore, no error.

But we cannot hold the same of the second element of the instruction. In this part of the instruction the question is submitted to the jury whether the special contract is supported by a good *consideration*, namely, the consideration of the plaintiff receiving reduced rates for the transportation of the horse or of his having received "some other advantage or benefit in shipping and carrying said horse, which he would not have received but for entering into the said contract." It is true that the pleadings were so drawn as to raise an issue touching the consideration of this contract. The words of the answer, in which the contract was pleaded, averred that it was "for a valuable consideration," and this was controverted by that part of the reply which consisted of a general denial of the new matter set up

in the answer. But the contract itself, upon its face, imported that it was "for and in consideration of rate named, six dollars and thirty cents per car, and privileges above enumerated." It is true that there are no "privileges above enumerated" which could apply to this contract, but instead of privileges there is a long list of negations, all drawn with the view of protecting the company. But, notwithstanding this, the recital in the contract that it is made in consideration of the rate of six dollars and thirty cents per car makes the contract import, *prima facie*, a consideration, such as would cast the burden of proving that there was no consideration upon the plaintiff. It is held by our supreme court that the consideration clause in such a contract has only the force of a receipt, and is open to explanation or contradiction by parol evidence. *McFadden v. Railroad*, 92 Mo. 343, 351. But no such evidence was given. What evidence there was, bearing upon this question, supported the consideration of the contract. It was to the effect that the defendant had a special rate for the shipment of valuable horses, and that the cost of shipping horses worth fifteen hundred dollars from St. Louis to Louisiana, Missouri, would be twenty-eight dollars, according to this special rate. This evidence was excluded. No evidence was adduced, tending to show that this rate of six dollars and thirty cents was not a reduced rate, when compared with the rate which would be charged for the horses, if the defendant should undertake to ship without a special contract, but under its responsibility of insurer as a common carrier under the rules of the common law. We, therefore, think that this portion of the instruction injected an element into the case which was not presented by the evidence, and was hence erroneous, It left it to the jury to say whether this rate of six dollars and thirty cents for the two horses was less than the usual and reasonable rates for carrying horses of that character from St. Louis to

Louisiana, Missouri, and whether the defendant gave to the plaintiff some other advantage or benefit in shipping the horse which was killed and one which the plaintiff would not have received but for entering into the contract. We see no evidence in the case, upon which the jury could have answered these questions in the negative so as to overthrow the contract, and, therefore, we hold that it was error to submit the question to them. This error was very material; for several subsequent instructions which were given recalled the minds of the jury to the question submitted to them in this instruction, whether the contract was valid as being founded on a good consideration.

In respect of this question this case is different from the case of *McFadden v. Railroad, supra,* in this, that, in that case, evidence was adduced impeaching the recital of the contract in respect of its consideration, and the supreme court in its opinion laid stress on the fact that no exception was saved to the admission of that evidence. We here see no such evidence. The court gave instructions on the theory that, if the special contract which the defendant pleaded and offered in evidence was binding on the plaintiff, it operated to reduce the liability of the defendant to the sum of one hundred dollars, although the horse may have been killed by the defendant's negligence. We are of opinion that this was not a proper application of the law to the clause of the contract which attempted to limit the liability to that sum. That clause was as follows: "It is also agreed that the liability of the company for damage to valuable live stock shall not exceed one hundred dollars for each animal, except by special agreement." A distinction is taken under the decisions in this state, between a contract imposed by a common carrier on a shipper which contains a general limitation of value, and a contract between the carrier and the shipper in which the value of the thing shipped is

agreed upon so that in case of loss the damages become liquidated by the contract of the parties. In the former case, the general stipulation is inoperative in reducing the damages which the plaintiff recovers in the event of loss by negligence. In the latter case the effect of the contract is to liquidate the damages, although the loss may have been the result of negligence. This distinction will be seen by comparing the two decisions of our supreme court in *Harvey v. Railroad*, 74 Mo. 538, and *McFadden v. Railroad*, 92 Mo. 343, 352. "Such a contract," said HOUGH, J., in the former case, "fairly entered into, leaves the carrier responsible for its negligence, and simply fixes the rate of freight and liquidates the damages. This, we think, it is competent for the carrier to do. And where the reduced value is voluntarily fixed by the shipper with a view of obtaining a low rate of freight, without any knowledge on the part of the carrier that the property was of greater value, it would be a fraud upon the carrier to permit the shipper to recover a greater sum than fixed by him." This decision was approved by the supreme court of the United States in *Hart v. Railroad*, 112 U. S. 331, and was followed by the Kansas City Court of Appeals, in *Brown v. Railroad*, 18 Mo. App. 568. But, in the subsequent case of *McFadden v. Railroad*, 92 Mo. 343, the supreme court, speaking through Mr. Justice RAY, after quoting the above language (at page 353) said: "In the case now before us, there was no pretense that the plaintiff, or his agent, fraudulently concealed or falsely represented the real value of the mules. They were delivered without any inquiry or representations as to value. * * * There is no pretense that defendant was in any way deceived as to their value, or misled as to the degree of care they would require." The same observations may justly be made in respect of the facts disclosed at the trial of the case now before us. No representations of any kind were made by the

plaintiff to the defendant respecting the value of the horse. The clause which we have above quoted from the contract was not inserted in it in consequence of any such representations, or in pursuance of any agreement as to its value. On the contrary, the evidence as to the manner in which the contract was signed is that it was signed by an agent of the stock-yards company, who was the agent of both parties for that purpose, and to whom no special representations had been made touching the value of the horse.

This case, then, is not like the case of *Harvey v. Railroad, supra,* where the agent of the defendant asked the agent of the plaintiff the value of the horse, and was told that its value was one hundred dollars. But it is like the case of *McFadden v. Railroad, supra,* where it was held that the limitation as to value did not operate to reduce the damages to which the plaintiff was entitled in the case of negligence.

Moreover, it is to be observed that the language above recited from the contract is a general printed clause, applicable to any kind of an animal which might be shipped under the contract, and the contract itself shows that such an animal might be a horse, a mule, a stallion, a jack, a calf, a sheep or a hog. The language employed does not import a special agreement between the shipper and the carrier that either of the horses tendered and received for shipment should be regarded as of the value of one hundred dollars in case of loss. It was not, by its terms, a contract liquidating the damages, since, notwithstanding its terms, the carrier might have proved, if such were the fact, that the horse killed was not worth fifty dollars. We equally say that, in the absence of any fraud or misrepresentation as to the real value of the horse, the plaintiff is entitled, if it shall be established that the horse was killed through the negligence of the defendant, to recover its real value, although it may be in excess of one hundred

La Belle Sav. Bank v. Critchlow.

dollars. *Kirby v. Express Co.*, 2 Mo. App. 369; *Harvey v. Railroad*, 6 Mo. App. 585 ; *Nickey v. Railroad*, 35 Mo. App. 79, 87.

The judgment will be reversed, and the cause remanded. Judge BIGGS concurs. Judge ROMBAUER concurs in the result.